# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 7008 | **DATE** | 9/24/2003 |
| **CASE TITLE** | Cummins-Allison Corporation vs. Glory, Ltd., et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: This Court overrules the parties' objections to the Magistrate's Report and Recommendation dated February 10, 2003 and adopts Magistrate Schenkier's Report and Recommendation denying Cummins' motion for a preliminary injunction.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| ✓ | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| ✓ | Copy to judge/magistrate judge. | |
| TBK | courtroom deputy's initials | |

number of notices

SEP 2 5 2003

date docketed

docketing deputy initials

date mailed notice

Document Number

174

Date/time received in central Clerk's Office

mailing deputy initials

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CUMMINS-ALLISON CORP., an Indiana Corporation, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Civil Action No. 02 C 7008 ) Honorable Judge Ronald Guzman |
| GLORY, LTD., a Japanese Corporation; GLORY SHOJI CO., LTD., a Japanese Corporation; and GLORY (U.S.A.) INC., a California Corporation, | ) ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Magistrate Judge Sidney Schenkier, in his Report and Recommendation ("R & R") dated February 10, 2003, recommended denial of Plaintiff Cummins-Allison Corporation's ("Cummins") motion for a preliminary injunction in a patent infringement lawsuit against Defendant Glory (USA), Inc. ("Glory"). Cummins filed objections to the Magistrate Judge's recommendation that Cummins' motion for preliminary injunction be denied. Glory, while agreeing with Magistrate Judge Schenkier's overall recommendation, also filed objections as to the finding that the Cummins patent, as interpreted by the Magistrate Judge, is likely to be found valid. After reviewing over one hundred pages of objections and comments as well as hundreds of additional pages of supporting documents, this Court overrules the parties' objections and adopts Magistrate Schenkier's report and recommendation.

1

# BACKGROUND[1]

This matter arises out of Defendant Glory's alleged infringement of Cummins' U.S. Patent No. 6,459,806 ("'806 patent"). Cummins is an Indiana corporation that designs and manufactures equipment capable of receiving a stack of United States currency bills, counting and determining the denomination of the bills, and rejecting those bills identified as not genuine or "spurious." (R & R, p. 4). This equipment is used by banks, casinos, and other industries which process large amounts of currency. (*Id.*). Glory, a California corporation and the United States subsidiary of Glory, Ltd., also sells currency-handling machines, which are designed and manufactured by Glory, Ltd. in Japan. (*Id.*). Glory, Ltd.'s products are shipped into the United States by Glory Shoji, a Japanese subsidiary of Glory, Ltd. (*Id.*).

Cummins filed suit against Glory, Glory Ltd. and Glory Shoji on October 1, 2002, the same date the '806 patent was issued. (*Id.* at 1). In its complaint, Cummins alleged that all three companies infringed all 133 claims of the patent by selling four models of its desktop currency discriminators in the United States. (*Id.*). That same day, Cummins filed a motion for a preliminary injunction against Glory only. (*Id.* at 2). Cummins' motion is directed at the Glory GFR-S60 ("S60") and GFR-S80 ("S80") machines and focuses on independent claims 40, 76, and 101 and dependent claims 41-43, 46-48, 77, 78, 81, 105, 108, 110, and 111. (*Id.*).

The '806 patent was filed by Cummins on December 2, 1999 as the sixth in a

---

[1]The Magistrate's Report and Recommendation is extremely detailed as to the facts in this case. Because the parties have objected to many of these factual findings, we discuss them as part of the Discussion section.

series of patent applications dating back to February 5, 1990. (*Id.* at 4). The first in the series, Application No. 07/475,111 ("Application No. '111"), had the stated principal objective of providing "an improved method and apparatus for identifying and counting currency bills comprising a plurality of currency denominations." (Gatz Dec., Ex. A, CG0001840-41). This system additionally had the objective of being more economical and compact in size as compared to systems then available. (*Id.* at CG0001841).

Prior to this time, in 1989, the Mosler/Toshiba CF-420 machine had been introduced into the United States market. (R & R, p. 5-6). This machine was capable of identification, currency discrimination and counting. (*Id.* at 6). While it was smaller and less expensive than earlier generations of machines, it still was expensive and large in relation to the device claimed in Application No. '111. (*Id.*).

Sometime in 1999, the exact date being a matter of controversy, Cummins introduced the JetScan 4060 into the United States market. (*Id.*). The JetScan differed from the Mosler/Toshiba machine in that it only had one pocket and had an interrupted mode of operation, stopping when a spurious bill was found. (*Id.*). In contrast, the Mosler/Toshiba had one pocket for genuine bills, an overflow pocket, and a reject pocket for spurious bills and utilized a continuous mode of operation. (*Id.*). The JetScan also differed from the Mosler/Toshiba machine in that it processed at a faster speed and was twenty percent less expensive. (*Id.*).

On May 19, 1992, Cummins filed Application No. 07/885,648 ("Application No. '648"), which was designated as a continuation in part of Application No. '111. (*Id.* at 6-7). Application No. '111 was later abandoned but U.S. patent No. 5,291,196 ("the '196 patent") was granted on March 15, 1994 as a result of Application No. '648. (*Id.* at 7).

3

The preferred embodiment of the invention in the '196 patent speaks of the desirability of transporting a spurious bill to the system stacker while bringing the system to a halt with the spurious bill remaining at the top of the stacker system. ('196 patent, Col. 15, lines 18-23).

That same year (whether before or after the issuance of the '196 patent is unclear), Glory introduced the GFR-100 machine for sale into the United States. (R & R, p. 7). The GFR-100 had two output pockets and a continuous mode of operation. (*Id.*). Cummins was aware of the entry of the GFR-100 into the market by late 1994 as evidenced by an internal memorandum from Cummins' president. (*Id.* at 8). In his memorandum of December 15, 1994, Douglas Mennie, commented on the operating characteristics and specifications of the GFR-100, including the presence of a separate reject tray. (*Id.*). Mennie commented that, in his opinion, the use of a separate pocket "was not superior to the JetScan 4060 approach of stopping the machine when a spurious bill is encountered." (*Id.*). He stated that it would " take Glory 'a year or more . . . to get to the point where they can compete with the JetScan in a side-by-side test." (*Id.*) (citing Adli Dec., Ex. 27, CG 0013516-17).

Cummins then filed Application No. 08/127,334 ("Application No. '334") as a continuation of Application No. '648 on September 27, 1993. (R & R, p. 8). Application No. '334 amended and cancelled some claims in Application No. '648 but did not make any change to the specification. (*Id.*). This application resulted in the issuance of Patent No. 5,467,405 on November 14, 1995. (*Id.* at 8-9). On November 14, 1994, while Application No. '334 was still pending, Cummins filed Application No. 08/339,337 ("Application No. '337") as a continuation of Application No. '334. (*Id.* at 9). Again,

4

Cummins made no modification to the specification of the previous application. (*Id.*). Approximately eight months later, Cummins filed a petition for expedited consideration on the basis that Cummins believed that Toyocom USA infringed the claims of this application. (*Id.*). The Cummins' petition, however, did not assert that the Glory GFR-100 machine would infringe any of the claims. (*Id.*).

The patent examiner initially rejected Application No. '337 on the basis of improperly extending the right to exclude already granted in claim 1 of the '196 patent and that certain claims were rendered obvious in light of prior art. (*Id.* at 9-10). Cummins defended the application and distinguished it from prior art by stating that the single output pocket contributed to the attributes of being more compact and affordable 'by reducing the mechanical complexity of the device including a reduction in the number of parts." (*Id.* at 10) (quoting Gatz Dec., Ex. D., at CG000665). Patent No. 5,692,067 ("the '067 patent") was issued on November 25, 1997. (R & R, p. 11).

In early 1996, Cummins provided its sales force with information about the Glory GFR-100 product and how to market against it. (*Id.*). The information stated that the "Glory unit had a separate reject pocket for rejected bills, which allowed for continuous operation." (*Id.*). Cummins sales personnel were told that the separate reject pocket did not improve accuracy or speed in comparison to the JetScan product which stopped for each bill and allowed a determination of the reason that the particular bill was rejected. (*Id.*) (Citing Adli Dec., Ex. 31). At that time, Cummins also became aware of losing sales to the Glory GFR-100. (*Id.*) (Citing Adli Dec., Ex. 32). Further, Cummins' sales personnel reported that the additional pocket of the Glory machine was key to the customers' decisions to buy the competitive product. (*Id.*).

5

Cummins' then began offering its own multi-pocket version of the JetScan product in 1996 or 1997. (*Id.* at 12) (Citing Jones Sec. Dec. 31). However, Cummins states that it had envisioned offering the multi-pocket unit as early as 1990 but instead decided to focus its efforts initially on the single pocket unit due to resource constraints. (Jones Sec. Dec. ¶¶ 31-32).

On April 29, 1997, Cummins filed Application No. 08/841,203 ("Application No. '203"), which was a continuance of Application No. '337.[2] (R & R, p. 12). On February 3, 1998, the patent examiner rejected certain of the pending claims of Application No. '203 on the basis of double patenting and obviousness in light of the prior art of the Jones and O'Maley machines. (*Id.*). Claims were also rejected as being anticipated by the Glory GFB-200/210/220/230 desktop banknote counter. (*Id.*). The patent examiner described the GFB-200 series as containing "a device for detecting different banknote denominations during counting; a detection function which flags a banknote that is not identified by stopping the counting process; and a single output receptacle." (*Id.*) (Citing Gatz Dec., Ex. E, CG0001566-74). Cummins defended by stating that 'O'Maley teaches the use of at least two output receptacles' while "the rejected claims all provided for only a single output receptacle." (Gatz Dec., Ex. E, CG000470; R & R, p. 14). After an additional rejection by the examiner and reply and amendment by Cummins, the patent examiner issued as notice of allowability and on February 22, 2000, granted Patent No. 6,028,951 ("the '951 patent").

During the nearly three year period from filing the '203 application until the '951

---

[2] Due to a clerical error, the R & R stated that Glory filed Application No. 203.

6

patent was issued, the JetScan product and the Glory GFR-100 competed in the marketplace. (R & R, p. 14). In 1998, there was evidence that some customers preferred the Glory product over the JetScan due to the perception that the Glory product, with its continuous operation, was faster and more accurate. (*Id.* at 14-15) (citing Adli Dec., Ex. 26). Later that year, Cummins filed a patent infringement suit against Glory and Glory, Ltd. in which Cummins claimed that Glory's GFB-700 product infringed two of Cummins' patents, one of those being the '067 patent. *Cummins-Allison Corp. v. Glory USA, Inc.*, 98 C 6673 (N.D. Ill.). The lawsuit was dismissed pursuant to a settlement in which it was agreed that Glory would replace its one-pocket GFB-700 with its two-pocket GFR-100. (R & R, p. 15). Although Glory sought a further agreement that Cummins "would not sue over the sale of the GFR-100 and any other products that were 'insubstantially different' from the GFR-100," Cummins declined. (*Id.*) (citing Gatz Dec., Ex. N, P, and Q).

On December 2, 1999, Cummins filed Application No. 09/453,200 ("Application No. '200") as a continuation of Application No. '203. (R & R, p. 15). Just prior to this, in November 1999, Glory started selling the S80 machines in the United States and, in that same time frame, met with Cummins to demonstrate the new product. (*Id.* at 15-16). On December 2, 1999, the same day that Cummins filed Application No. '200, Cummins wrote a letter to Glory stating that "with the introduction of any new product, there is a recognized potential for issues relative to intellectual property rights of others." (Jones Sec. Dec., Ex. 1). Cummins requested an S80 scanner along with other items such as software, schematic and operating information. (R & R, p. 16). Glory responded by first stating its surprise that there might be an issue and requested that Cummins identify

7

which patents it believed might be relevant to the S80. (*Id.*). Neither party apparently supplied the requested information to the other. (*Id.*).

After an amendment and cancellation of certain claims, the examiner rejected all remaining claims on November 13, 2001 on the basis of double patenting over claims of the '067 patent or obviousness based on prior art. (*Id.* at 16-17). In response, Cummins argued that no prior teaching would have suggested combining the features of the Jones and O'Maley machines and distinguished its claims by asserting that:

> O'Maley fails to teach or suggest 'automatically denominating bills of a plurality of U.S. denominations at a rates in excess of 800 bills per minute,' 'delivering bills which have been evaluated to an output region comprising one and only one stacker wheel containing output receptacle,' 'restacking bills that had been denominated in a single stack using a stacking mechanism comprising flexible blades,' 'restacking bills that have been denominated in a denominated bill output receptacle using a stacking mechanism comprising flexible blades,' or 'delivering any bill that has been denominated to one and only one output receptacle.'

(Gatz Dec., Ex. F, CG0000015). On October 1, 2002, Application No. '200 issued as the '806 patent and this lawsuit was brought against Glory the same day. (R & R, p. 1, 18).

## DISCUSSION

A *de novo* standard is applied to a district court's review of objections to a Magistrate Judge's findings in an R & R. *See* U.S.C. 636(b)(1)(B); Fed.R.Civ.P. 72(b). Although a *de novo* determination is required, the Supreme Court has held that a *de novo* hearing is not required to review the Magistrate Judge's findings or credibility recommendations. *United States v. Raddatz*, 447 U.S. 667, 675, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Instead, the district court has the discretion to "accept, reject or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge." 28 U.S.C. § 636(b)(1)(C).

### Standard for Preliminary Injunction

The decision to grant a preliminary injunction is within the discretion of the district court. *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1555 (Fed. Cir. 1994). However, in order to prevail on a motion for a preliminary injunction, the moving party must establish its right to relief based on four factors: (1) a reasonable likelihood of success on the merits; (2) irreparable harm if the relief is not granted; (3) balance of the hardships that weigh in its favor; and (4) impact on the public interest. *Id.* While none of these factors alone are dispositive, courts will not grant a preliminary injunction unless the movant establishes the first two factors, the likelihood of success on the merits and irreparable harm. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001).

9

## I. LIKELIHOOD OF SUCCESS ON THE MERITS

In a patent infringement case, in order to prevail on the first factor, likelihood of success, the patent holder must prove two elements: (1) that the patent is valid; and (2) that the defendant has infringed upon that patent. *Hybritech Inc. v. Abbott Laboratories,* 849 F.2d 1446, 1451 (Fed. Cir. 1988). Because the validity of the patent depends upon how the claims are construed, we address the infringement issue first.

### Infringement

In determining if a patent has been infringed, courts typically use a two-step process. *O.I. Corp. v. Tekmar Co., Inc.,* 115 F.3d 1576, 1580 (Fed. Cir. 1997). First, the claim must be properly construed to determine its scope and meaning and, second, the properly construed claim must be compared to the device or process accused of infringement. *Id.*

### *Claim Construction*

Claim construction is a matter of law for the court to decide. *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 372 (1996). In making its determination, the court looks at the claim language, the specification, and the prosecution history. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd,* 517 U.S. 370 (1996). Additionally, if the claim involves a step-plus-function limitation, then Section 112, ¶ 6 applies. 35 U.S.C. § 112, ¶ 6 (1994). This Section provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

*Id.*

When a claim uses the phrase "step for," there is a presumption that Section 112, ¶ 6, applies. *Seal-Flex, Inc. v. Athletic Track and Court Construction*, 172 F.3d 836, 849 (Fed. Cir. 1999). However, even in the absence of this express language, Section 112 will nevertheless apply if the claim only states a function without stating an act for performing that function. *Id.* If a court finds that a claim is subject to a step-plus-function limitation, it must "look[] to the specification for acts corresponding to the step-plus-function element which are necessary to perform the recited function." *Micro Chemical, Inc. v. Great Plains Chemical Co. Inc.*, 194 F.3d 1250, 1259 (Fed. Cir. 1999).

Courts have interpreted the "term 'steps' to refer to the generic description of elements of a process, and the term 'acts' to refer to the implementation of such steps." *O.I. Corp.*, 115 F.3d at 1583. They have also determined that "structure and material go with means, acts go with steps." *Id.* Therefore, Section 112 is "implicated only when steps *plus function* without acts are present." *Id.* Additionally, courts have distinguished between acts and functions by stating that "the 'underlying function' of a method claim element corresponds to *what* that element ultimately accomplishes in relationship to what the other elements of the claim and the claim as a whole accomplish. 'Acts,' on the other hand, correspond to *how* the function is accomplished." *Masco Corp. v. United States*, 303 F.3d 1316, 1327 (Fed. Cir. 2002) (quoting *Seal-Flex, Inc.*, 172 F.3d at 849-50). Use of the step-plus-function claim construction subjects the claim to the limitation of the steps specified in the written description or their equivalents. *O.I. Corp.*, 115 F.3d at 1583.

At issue in this case are three independent claims of the Cummins '806 patent, claim numbers 40, 76, and 101. The claims read as follows:

40. A method of processing currency bills using a U.S. currency evaluation device comprising:

receiving a stack of bills to be evaluated in an input receptacle of the device including bills of a plurality of denominations, each bill being rectangular and having a wide dimension and a narrow dimension;

transporting the bills, one at a time, from the input receptacle along a transport path in a transport direction with their narrow dimension parallel to the transport direction;

automatically denominating bills of a plurality of U.S. denominations; and

restacking bills that have been denominated in a denominated bill output receptacle using a stacking mechanism comprising flexible blades;

wherein after processing the entire stack of bills, the denominated bill output receptacle contains a set of bills, all of whose denominations are known, including bills of a plurality of denominations.

76. A method of processing currency bills using a high-speed U.S. currency evaluation device comprising:

receiving a stack of bills to be evaluated in an input receptacle of the device;

transporting the bills, one at a time, from the input receptacle along a transport path at a rate in excess of 800 bills per minute;

automatically denominating and totaling bills of a plurality of U.S. denominations at a rate in excess of 800 bills per minute; and

delivering any bill that has been successfully evaluated and totaled to one and only one output receptacle.

101. A method of processing currency bills using a high-speed U.S. currency evaluation device comprising:

receiving a stack of bills to be evaluated in an input receptacle of the device, the bills having a narrow dimension;

transporting the bills, one at a time, from the input receptacle along a transport path in a transport direction at a rate in excess of 800 bills per minute with their narrow dimension parallel to the transport direction; and

automatically denominating bills of a plurality of U.S. denominations at a rate in excess of 800 bills per minute.

('806 patent, Col. 33, lines 33-52; Col. 36, lines 40-51; Col. 38, lines 38-50).

Cummins alleges that Glory's S60 and S80 products infringe its '806 patent

because "each (a) receives a stack of U.S. currency bills to be evaluated in an input

receptacle, and the bills can include different denominations, (b) transports the bills at

1000 bills/minute one at a time from the input receptacle along a transport path with the

12

narrow dimension of the bills parallel to the transport direction, (c) automatically denominates the bills of all denominations at 1000 bills/minute, and (d) automatically stacks the denominated bills in an output receptacle after they have been evaluated." (Cummins' Memorandum in Support of Motion for Preliminary Injunction, October 9, 2002, p. 7-8) ("Cummins' Support Memorandum") (citing Mennie Dec., 14). Glory counters that its products are different than those covered by the '806 patent because its products contain multiple pockets and use a different data processing method. (Memorandum of Defendant Glory (U.S.A.) Inc, in Opposition to Plaintiff's Motion for Preliminary Injunction, Nov. 20, 2002, p. 10-12) ("Glory Memorandum"). This Court will consider each of Glory's alleged differentiations after completing its claim construction.

*A. Number of Pockets*

Of the three independent claims focused on by the parties, only Claim 76 makes a reference to the number of output receptacles. It states that, after successful denomination, the bill is delivered to "one and only one output receptacle." Although singular language is used to describe the output receptacle in Claim 40, this is not conclusive and Claim 101 makes no reference whatsoever to the number of output pockets. The dependent claims at issue use similar language. Therefore, analysis of the claim language alone, while not conclusive, tends to support Glory's contention that the Cummins' patent is for a single pocket machine.

Similarly, review of the written specifications is not conclusive. While neither the drawings nor the written specifications specifically call out the use of multiple pockets, the language could be interpreted either way. For instance, the patent states that

13

the scanned bill is transported to "a bill stacking station" and the "no call" bill is removed from "the stacker." ('806 patent, Col. 5, lines 59-60; Col. 16, lines 28-29). Furthermore, Columns 16-17 state that the system comes to a complete halt after detection of a spurious bill to allow removal of the bill from the top of the stacker, thus implying that there is only one output receptacle. (*Id.*, Col. 16-17). However, later in Column 17, lines 59-63, the patent states that the system may either be stopped after detection of a spurious bill or that the bill may be diverted to a separate stacker bin. (*Id.*, Col. 17, 59-63). This language could suggest the use of multiple pockets. Therefore, while, on balance, the written specifications suggest the use of a single pocket, they are not conclusive in determining the claim construction. As a result, this Court looks to the prosecution history.

Initially, the '806 patent was rejected for obviousness based on combination of the prior art of the Jones and O'Maley machines. (Gatz Dec., Ex. F, GC0000014). The Jones machine was capable of counting bills, had a single output receptacle, but could not determine the denomination of the bills. (Gatz Dec. Ex. E, CG0000470; Gatz Dec. Ex. F, CG0000014). The O'Maley machine, on the other hand, was capable of determining denomination, had a continuous operation with multiple output pockets, but could not count the bills. (*Id.*). To overcome these objections for obviousness, Cummins stated that the '806 patent was distinguishable, at least in part, because it contains the limitations of "'automatically denominating bills of a plurality of U.S. denominations' and either 'delivering bills which have been evaluated to an output region comprising one and only one stacker wheel containing output receptacle,' 'restacking bills that have been denominated in a single stack using a stacking mechanism comprising flexible blades,' or

14

'restacking bills that have been denominated in a denominated bill output receptacle using a stacking mechanism comprising flexible blades.'" (Gatz Dec., Ex. F, CG0000015). Cummins also alleged that other claims were distinguishable because they contain the limitations of 'automatically denominating bills of a plurality of U.S. denominations' and 'delivering any bill that has been denominated to one and only one output receptacle' (*Id.*). Finally, Cummins stated that:

> Jones relates to a simple note counter which is incapable of "automatically denominating bills of a plurality of U.S. denominations." O'Maley fails to teach or suggest "automatically denominating bills of a plurality of U.S. denominations at a rate in excess of 800 bills per minute," delivering bills which have been evaluated to an output region comprising one and only one stacker wheel containing output receptacle," "restacking bills that have been denominated in a single stack using a stacking mechanism comprising flexible blades," "restacking bills that have been denominated in a denominated bill output receptacle using a stacking mechanism comprising flexible blades," or "automatically denominating bills of a plurality of U.S. denominations" and "delivering any bill that has been denominated to one and only one output receptacle."

(*Id.*). All of this language suggests a single-pocket machine.

Further, the '806 patent was issued as a continuation-in-part of the '067 and '951 patents and the patent examiner had these same objections based on prior art (R & R at 40). In response to the objections, Cummins puts forth that the inventions did more than combine the teachings of the single output receptacle note counter invented by Jones with O'Maley's multiple output receptacle denomination discriminator. (Gatz Dec., Ex. D, CG0000662-63). Cummins explained to the examiner, in regard to the '067 patent, that the single pocket with a required halting mechanism, along with the improved method of currency denomination, distinguished the new product from prior art because it satisfied the "long felt need" for a lighter, more compact machine. (Gatz Dec., Ex. D,

CG0000662-65). In regard to the '951 patent, Cummins defended against non-obviousness based on prior art by stating that its claims are "distinguishable because they contain the limitations of a single output receptacle and a discriminating unit," "because they contain the limitations of transporting bills to a single output receptacle" and that "O'Maley teaches the use of at least two output receptacles." (*Id.*, Ex. E, CG0000470).

Again, all of the above comments regarding the '806 patents and its parent patents suggest that a single-pocket, non-continuously operating machine is at least part of what distinguished the Cummins machine from prior art. After reviewing the prosecution history, the Magistrate Judge concluded that the '806 patent was limited to a non-continuously operating machine with a single output receptacle. (R & R, p. 42). We find that the combination of the claims, specifications and prosecution history lead to the overwhelming conclusion that the patent is limited to a single output device and, therefore, agree with the findings of the Magistrate Judge.

Cummins, in its objections, stated that the Magistrate Judge had erroneously relied upon remarks made to the patent examiner that were later withdrawn in the prosecution of the '951 patent. (Cummins' Objections to Report and Recommendation of Magistrate Judge, p.2-3, n. 12) ("Cummins' Objections"). While it is true that the Magistrate Judge did consider those remarks in his analysis, there is still ample evidence in the record, as demonstrated above, to support his conclusions without the use of the withdrawn remarks. Therefore, even if the remarks can properly be withdrawn from the record without the use of a formal petition, the withdrawal of this information does not change this Court's conclusion that the Magistrate Judge correctly found that the '806 patent is limited to a single-pocket device.

16

## B. Method of Denomination

The second way that Glory claims its products are different than those covered by the '806 patent is that the Glory machine uses a different denomination method. The dispute between the parties centers around the term "automatically denominating" and whether this phrase calls out a "function" or an "act." (R & R, p. 26). Cummins argues that the phrase describes an act while Glory contends that the phrase describes a function and is, therefore, subject to a step-plus-function analysis. (Cummins Reply Memorandum in Support of Motion for Preliminary Injunction, Dec. 6, 2002, p. 28-33 ("Cummins' Reply"); Glory Memorandum, p. 46-48). After reviewing the Cummins' patent claim language, the Magistrate Judge, agreeing with Glory, concluded that the term "automatically denominating" was subject to Section 112, 6 "because it discloses a function without disclosing the structure, material, or acts necessary to perform it." (R & R, p. 26 -27). This Court agrees with the findings of the Magistrate Judge.

Claims 40, 76, and 101 are not written in the "step-for" format, but are, nevertheless, subject to a step-plus-function analysis because they do not recite an act. Therefore, this Court must look to the specifications to determine the acts necessary to perform the stated function. In doing so, it is clear that multiple acts are required to "automatically denominate" the bills, including "transporting the bills so that the bills pass through the scan head; scanning the bills using a light source and a photo sensor to obtain reflected light samples; and processing the optical signal data by a processor to determine the denomination." (Glory Memorandum, p. 46). Specifically, the acts necessary to perform the "automatically denominating" function require the use of the "improved optical sensing and correlation technique" which is described in great detail in

17

the specification and which requires the comparison of a correlation value obtained from the scanned bill to stored master characteristic patterns. ('806 patent, Col., 2, line 53; Col. 3, lines 37-47; Col. 11-14). Therefore, because a step-plus-function construction subjects the claim to the limitation of the steps specified in the written description, or their equivalents, this Court construes the claims to require optically scanning the bills and processing the optical signal by use of correlation data and stored master characteristic patterns, or its equivalent, to determine denomination.

## Claim Comparison

After determining the proper scope and meaning of the claims in question, the court must compare the properly construed patent to the device accused of infringement. Comparison is a question of fact. *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995). For literal infringement, every limitation set forth in a claim must be found in the accused product. (*Id.*). Additionally, a product may infringe a patent under the doctrine of equivalents "if the accused process performs substantially the same function in substantially the same way to obtain the same result as is set forth in the claim." *Mark I Marketing Corp. v. R.R. Donnelley & Sons Co.*, No. 92-C-8380, 1994 WL 603884, at *5 (N.D.Ill. Nov. 1, 1994). "An element in the accused product is equivalent to a claim element if the differences between the two are 'insubstantial' to one of ordinary skill in the art." *Overhead Door Corp. v. The Chamberlain Grp., Inc.*, 194 F.3d 1261, 1269 (Fed. Cir. 1999) (citing *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39-40 (1997)).

An infringement analysis under Section 112, ¶ 6 involves the same two steps of claim construction and comparison. *IMS Technology, Inc. v. Haas Automation, Inc.*, 206

18

F.3d 1422, 1429 (Fed. Cir. 2000). For literal infringement under Section 112, ¶ 6, the step of comparison begins with determining if the accused devise performs an identical function to the one recited in the claim. (*Id.* at 1430) (citing *Mas-Hamilton Grp., v. LaGard, Inc.*, 156 F.3d 1206, 1211-12 (Fed. Cir. 1998)). "If the identical function is performed, the next step is to determine whether the accused device uses the same [] acts found in the specification, or their equivalents." *Id.* Where after-developed technology is not involved, a finding of non-equivalence under Section 112, ¶ 6, should preclude a contrary finding under the doctrine of equivalents. *Chiuminatta Concrete Concepts Inc. v. Cardinal Industries Inc.*, 46 U.S.P.Q.2d 1752, 1758 (Fed. Cir. 1998).

As construed, the Cummins' '806 patent is for a single-pocket, non-continuously operating machine that uses master correlation patterns to denominate a plurality of bills. The Glory product contains multiple pockets, is not required to stop upon detection of a spurious bill, and uses a complex set of formulas to denominate the bills. (Glory Memorandum, p. 43-47) (citing Mouri Decl. 78). Because each of the claim elements of the Cummins machine is not found in the Glory product, there can be no literal infringement. Further, because the difference between the number of pockets is not insubstantial, there is no infringement under the doctrine of equivalents. Additionally, there is no infringement under Section 112, ¶ 6. Although both machines perform the same function of denominating, there is no infringement because the acts necessary to perform the denominating function in the Cummins machine are not identical or equivalent to that used in the Glory machine. This Court, therefore, finds that Cummins is not likely to succeed on its infringement claim.

We acknowledge the objections made by Cummins regarding the reluctance of

19

the Federal Circuit to construe a methods claims as subject to a step-plus-function limitation. (Cummins Reply, p. 28-32). However, even assuming Cummins' argument that the step-plus-function limitation does not apply to the term "automatically denominating" and that the claim should be interpreted more broadly, the result is not changed because the difference in the number of pockets contained in the two machines is not insubstantial. This Court, having considered the issue from a number of different aspects, concludes that there are substantial differences between the two competitors' products and that Cummins has not proven that it would likely succeed on the infringement prong of its case.

## Validity

A patent is presumed to be valid and this presumption can only be overcome by clear and convincing evidence. 35 U.S.C. § 282 (1994); *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360 (Fed. Cir. 1984). Nevertheless, a patent holder seeking a preliminary injunction against an accused infringer bears the burden of proving the likelihood of success in relation to the validity of its patent. *Helifix Ltd, v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1351 (Fed. Cir. 2000). Additionally, if the accused infringer raises a substantial question regarding the validity, "i.e. asserts an invalidity defense that the patentee cannot prove 'lacks substantial merit,' the preliminary injunction should not issue." *Id.* (quoting *Genentech, Inc. v. Novo Nordisk*, 108 F.3d 1361, 1364 (Fed. Cir. 1997)). Further, validity challenges may be successful in raising a substantial question at the preliminary injunction stage on evidence that would not suffice to prove invalidity at trial. *Amazon.com, Inc.*, 239 F.3d at 1358. "Vulnerability is the issue at the preliminary injunction stage," while invalidity must be shown at trial by a

20

clear and convincing standard. *Id.* at 1359. If the alleged infringer is able to raise a substantial question, the burden then shifts to the patent holder to prove that the defense "lacks substantial merit." *Heliflx*, 208 F.2d at 1351.

Cummins makes its argument for patent validity based on the strong presumption afforded by statute as well as the fact that, in issuing the patent, the patent examiner reviewed "99 U.S. patents, 39 foreign patents, and 39 other references." (Cummins' Support Memorandum, p. 8). Glory, in its response, claims that the Cummins '806 patent is invalid based on (1) prior art, (2) lack of a written description supporting the claims, (3) public use by Cummins more than one year before the filing date of the patent and (4) that the patent is unenforceable due to prosecution laches. (Glory Memorandum, p. 12). This Court will consider each of these arguments in turn.

## 1. Prior Art

According to statute, patent claims are invalid if they are obvious based on prior art. 35 U.S.C. 103. Specifically, Section 103 states that a patent may not be issued if:

> The differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

*Id.*

The Supreme Court has identified four factors to be used in assessing a prior art defense. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966). The factors are: (1) determination of the scope and content of the prior art; (2) ascertainment of the differences between the prior art and the claims at issue; (3) determination of the level of ordinary skill in the art; and (4) secondary considerations such as commercial success,

long felt but unsolved needs and failure of others. *Id.* In applying these factors, courts have held that "the mere existence in the prior art of individual features of a patented invention does not without more invalidate the patent under the obviousness test." *Mitsubishi Electric Corp. v. Ampex Corp.,* 190 F.3d 1300, 1309 (1999), *cert. denied,* 120 S.Ct. 1556, (2000).

Glory claims that each of the limitations of claims 76 and 101, with the exception of speed, were present in prior art of the Mosler/Toshiba 420 and Billcon machines, and that each of the limitations of claim 40, with the exception of flexible blades, were also present in the prior art of the Mosler/Toshiba CF-420 machine. (Glory Memorandum, p. 18-20). Glory further claims that the speed of the prior art machines was limited only by the technology of microprocessors available at the time and, therefore, it would have been obvious to increase the speed as the capability of the microprocessors improved. (*Id.*). Finally, Glory states that by Cummins' own admission, flexible blades were widely used in currency discriminators at that time. (*Id.* at 20; Dolsen Decl., Exhibit 7).

Cummins, in its response, states that each of the machines or items listed as prior art by Glory were specifically considered by the patent examiner, except for the higher-speed microprocessors, "which were ubiquitous by 1990." (Cummins' Reply, p. 4, 6). Therefore, Cummins, relying on *American Hoist,* correctly states that Glory bears a heavy burden of proof in showing the patent invalid due to prior art. (*Id.*; *American Hoist,* 725 F.2d at 1359 (holding that where the attacking party is relying on no prior art other than that considered by the PTO examiner, he has the added burden of overcoming deference to a qualified government agency).

The Magistrate Judge, after a thorough review of evidence presented by both

22

parties, concluded that Glory did not raise a substantial question regarding validity due to prior art. (R & R, p. 63). As construed by the Magistrate Judge, the claims for the '806 patent are limited to a device with a single output pocket and a controlled, required stopping mechanism after the scanning of a bill identified as spurious. (*Id.* at 69-70). The Magistrate Judge found that the Mosler machine, while being similar in that it uses an input hopper, has an optical sensing mechanism, a counting function for mixed denominations, and one or more output pockets, it failed to teach the invention claimed by the '806 patent because the Mosler machine is not required to stop after detecting a spurious bill. (*Id.* at 65). Additionally, the Magistrate Judge concluded that the Billcon machine could not properly be considered as prior art because it was designed for Japanese currency and sold exclusively in Japan. (*Id.* at 66). Hence, it could not qualify as prior art under a Section 103 obviousness defense because to do so it must, under Section 102, be "known or used by others in this country" or must be "in public use or on sale in this country." 35 U.S.C. 102. Therefore, because Glory did not present evidence that the Billcon machine met this standard, the Magistrate Judge rejected the machine as prior art. (R & R, p. 66). The Magistrate Judge also rejected the argument that increasing the speed of the machine was obvious just because the technology had changed. (*Id.* at 68).

In response, Glory argues that the Billcon machine should, in fact, be considered as prior art on the basis of its brochure and manual. (Objections of Defendant Glory (U.S.A.) Inc. to the Report and Recommendation of the Magistrate Judge Concerning Plaintiff's Motion for Preliminary Injunction, March 4, 2003, p. 14) ("Glory's Objections to R & R"). The Court overrules this objection because Glory did not attempt to identify

23

what portions of the documents suggest or teach the limitations of the claim. (Cummins' Memorandum in Opposition to Glory's Objections to the Report and Recommendation of the Magistrate Judge Concerning Cummins' Motion for Preliminary Injunction, March 18, 2002, p. 11-12). Further, both the Operation Manual and the Service Manual of the Billcon machine were disclosed to the patent examiner and he did not reject on the basis of the prior art of the Billcon machine. (Gatz Dec., Ex. F, CG 0000014, CG0000183). This adds further support to the finding that the Billcon machine is not properly considered prior art.

Using the above analysis, the Magistrate Judge then looked at the four *Graham* factors to determine if Glory had raised a substantial question concerning the validity of the Cummins' patent based on prior art. (R & R, p. 69-70) The Magistrate Judge found that because the prior art referenced by Glory did not involve the same scope and claims as the Cummins' patent, as construed, the first two *Graham* factors did not weigh in favor of finding the patent invalid due to obviousness of prior art. (*Id.*). Similarly, the Magistrate Judge found that the third *Graham* factor, level of ordinary skill in the art, did not weigh in favor of invalidity due to obviousness of prior art. (*Id.*). According to Cummins, a person of ordinary skill at the time of the '806 patent development was a person with an engineering degree and at least one year of experience in electromechanical devices. (*Id.* at 70) (citing Cummins Reply, p. 8; Second Mennie Dec., 43). The Magistrate Judge reasonably concluded that such a person would not find the '806 patent claims obvious, as construed. (*Id.*). Finally, the Magistrate Judge found that secondary considerations such as the need for small, inexpensive, high-speed multiple-currency counters and the success of the JetScan products weighed in favor of

24

disallowing the prior art defense. (*Id.*). This Court finds the Magistrate Judge's analysis is legally sound and adopts the findings.

## 2. Lack of Written Description

35 U.S.C. 112 deals with the requirements for a written description of the invention. It states the following:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. §112.

Glory states that if the claims of the '806 patent are construed to include multiple pocket machines, the patent is invalid due to lack of written description. (Glory Memorandum, p. 21). However, because this Court has previously construed the claims of the '806 patent to include only a single pocket machine, which is adequately described in the specifications, there is no issue of invalidity due to lack of a written description.

## 3. Public Use

35 U.S.C. Section 102 states that a person is entitled to a patent unless "the invention was . . . in public use . . . more than one year prior to the date of the application for patent in the United States." 35 U.S.C. 102(b). Determining if an invention exceeds the one-year public use limitation is a question of law based on underlying issues of fact. *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 737 (Fed. Cir. 2002), *cert. denied*, 123 S.Ct. 537 (2002). Use of an invention by the inventor himself or another under the direction of the inventor for the purposes of experimentation and perfection does not

constitute a public use. *Elizabeth v. Pavement Co.*, 97 U.S. 126, 134 (1877). Further, an inventor may perfect his invention through testing, even if done in the public eye, without losing his right to a patent. *Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 64 (1998). The law has long recognized the difference between experimental and commercial use. *Id.* "When an evaluation period is reasonably needed to determine if the invention will serve its intended purpose, the § 102(b) bar does not start to accrue while such determination is being made." *Seal-Flex, Inc. v. Athletic Track & Court Constr.*, 98 F.3d 1318, 1324 (Fed. Cir. 1996).

The key issue is not public knowledge of the invention but the public use or sale of the invention. *TP Labs. Inc. v. Prof'l Positioners, Inc.*, 724 F.2d 965, 970 (Fed. Cir. 1984). The time period starts running when the inventor knows his invention works for its intended purpose or is reduced to practice. *Id.* At that point, "further 'experimentation' may constitute a barring public use." *New Railroad Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1297 (Fed. Cir. 2002). *See also RCA Corp. v. Data Gen. Corp.*, 887 F.2d 1056, 1061 (Fed. Cir. 1989) ("experimental use, which means perfecting or completing an invention to the point of determining that it will work for its intended purpose, ends with an actual reduction to practice").

The party claiming invalidity must prove that 'the subject of the barring activity met each of the limitations of the claim, and thus was an embodiment of the claimed invention.' *Juicy Whip*, 292 F.3d at 737 (quoting *Scaltech Inc. v. Retec/Tetra, L.L.C.*, 178 F.3d 1378, 1383 (Fed. Cir. 1999)). "The statutory presumption of validity provided in 35 U.S.C. § 282 places the burden of proof upon the party attacking the validity of the patent, and that burden of persuasion does not shift at any time to the patent owner." *TP*

*Labs. Inc.*, 724 F.2d at 971. However, if a *prima facie* case of public use is made, the patent holder must be able to counter with convincing evidence. *Id.* A determination of public use can only be made after considering the entire surrounding circumstances including the length of the test period, whether payment was received, whether there was an agreement regarding secrecy, whether records were kept, whether persons other than the inventor conducted tests, and how many tests were conducted. *Id.* at 971-72.

Glory contends that the '806 patent is invalid due to public use of a machine embodying all of the claimed elements of the patent more than one year from the patent filing date of May 19, 1992 by third parties without a confidentiality agreement. (Glory Memorandum, p. 26). Specifically, Glory claims that the public use of Cummins Currency Recognition Counter ("CRC"), which was later redesignated as the JetScan product, commenced as early as January 1991. (Glory Memorandum, p. 26). Glory bases its claim on several items. First, Glory claims that the '806 patent was reduced to practice by January 31, 1991 as evidenced by statements from Cummins personnel that the machines were working well. (*Id.* at 27) (citing Adli Decl., Ex. 2-3). Second, Glory contends that Cummins did not obtain any confidentiality or written agreements before placing the test machines at the customer sites and, third, that the machines were not subject to Cummins' control while at the sites and were left for as long as four weeks. (Glory Memorandum, p. 28, 30-31). Fourth, Glory claims that the machines embodied all of the claims of the '806 patent. (*Id.* at 32).

Cummins, in response, claims that all "public use" referred to by Glory was part of its experimental testing and that many of the facts relating to the testing were presented to the USPTO. (Cummins' Reply, p. 13-14). Cummins states that it was

27

necessary to test externally because it did not have access to large enough amounts of cash and because it needed to test its machines in real world environments. (Cummins' Reply, p. 17) (citing Second Mennie Decl., ¶ 5-6). Further, Cummins claims that it only tested at a small number of customer sites and that the customers were chosen because of the good relationship to Cummins. (*Id.* at 18) (citing Second Mennie Decl., ¶ 10). Cummins states that the sites were also chosen because it was unlikely that competitors would visit and access to the machines would be limited. (*Id.*, ¶ 10). Finally, Cummins argues that it did not relinquish control of the tests, that all tests were conducted under the direction of Cummins, that Cummins' employees regularly visited the sites and monitored the progress of the tests, that records were kept of the results, and that machines were removed promptly after testing was completed or if the machines did not work properly. (*Id.* at 19) (citing Second Mennie Decl., ¶¶ 15, 20, 27-28).

In addition to its argument that any prior use of its machines was of an experimental nature, Cummins argues that the CRC test machines did not embody the claims of the '806 patent. (*Id.* at 22). It states that the Cummins' machines could not achieve the speed required by many of the claims in the '806 patent until August 1991. (*Id.*) (citing Graves Decl., at ¶ 9-10). Cummins states that in January 1991, the time when Glory claims that the '806 patent was reduced to practice, its CRC machines were only capable of 700 bills per minute. (*Id.* at 23) (Gatz Decl., Ex. I, CG 0020032-35). Therefore, Cummins claims that Glory cannot prove invalidity because the CRC machines did not contain every limitation of the patent claims. (*Id.* at 22-23).

After the Magistrate Judge found that Glory had failed to raise a substantial question regarding the validity of the '806 patent based on public use, Glory renewed its

claims of invalidity, this time placing emphasis upon Cummins use of the term "beta testing," the fact that Cummins accepted a sales order for the machine on May 29, 1991 (almost one full year prior to the application filing date), and attacking the credibility of the Graves Declaration. (R & R, p. 60-61; Glory's Objections to R & R, p. 2-11). Glory also now claims that if credence is given to the Graves Declaration, wherein Graves testified that the Cummins machine was not capable of the higher speeds claimed in its '806 patent until August 1991, the patent is invalid due to lack of written description. (*Id.* at 10).

This Court finds persuasive the Cummins' argument that its testing of its machines did not constitute prior public use within the meaning of 35 U.S.C. 102(b) because the testing was experimental. This finding is based on a review of the entire circumstances regarding the testing. Cummins controlled the number of test sites, monitored the test results, kept records of the tests, did not charge for use of the machines, and did not conduct the tests for an unreasonably long period of time. All of Cummins' activities are within a normal range for perfecting an invention and Cummins had a valid need for external testing. Although Cummins did not insist upon written confidentiality agreements, it is clear that customers were aware that the project was to be confidential and that customers were chosen, at least in part, based upon limited access to the machines. Further, this Court specifically rejects Glory's claim that Cummins' testing was not experimental due to the use of the term "beta testing." The use of this term, in light of the described circumstances, is not determinative.

Because this Court finds that the prior use of the CRC machines was experimental, it is not necessary to address the issue of whether the machines met each of

the limitations of the '806 patent. Also, this Court declines to consider Glory's new argument that giving credence to the Graves Declaration would render the '806 patent invalid due to lack of written description. A court is not required to hear arguments that have not been made before a magistrate judge and any new arguments are generally considered to be waived. *United States v. Melgar*, 227 F.3d 1038, 1040 (7th Cir. 2000). This, however, is a flexible standard and a court does have discretion to hear the arguments. *Id.* In this case, we decline because it would not be outcome-determinative in deciding this motion for a preliminary injunction. Thus, this Court adopts the finding of the Magistrate Judge that the '806 patent is not invalid based upon prior public use.

## 4. Prosecution Laches

The Supreme Court has stated that the patent statutes "seek[] to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their rights." *General Electric Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 369 (1938). According to the equitable doctrine of prosecution laches, a patent may be held to be unenforceable if issued after unreasonable and unexplainable delay in prosecution, even though other requirements for a patent are met. *Symbol Technologies, Inc. v. Lemelson Medical*, 277 F.3d 1361, 1368 (Fed. Cir. 2002). *See also In re Stephen B. Bogese II*, 303 F.3d 1362 (Fed. Cir. 2002). The party claiming prosecution laches must establish it by a preponderance of the evidence. *A.C. Aukerman Co. v. R.L. Chaides Construction Co.*, 960 F.2d 1020, 1045 (Fed. Cir. 1992).

Using this equitable doctrine, Glory claims that the '806 patent is unenforceable. (Glory Memorandum, p. 36). Glory claims that until the current lawsuit was filed in October 2002, it "had no knowledge that Cummins possessed patent rights that would be

30

asserted to preclude [it] from selling the GFR S80 or GFR S60." (*Id.* at 38). Glory further claims that it had sold its multi-pocket, continuous-operation, currency discriminators in the U.S. for eight years by this time and that it had entered into a Settlement Agreement with Cummins in 1999 in which both parties agreed that Glory would replace its GFB 700 machines (single pocket, non-continuous units) with its GFR 100 machines (a multi-pocket, continuous unit). (*Id.* at 38). Glory states that although Cummins first applied for the '806 patent series in May 1992, it did not submit the broader claims of the '806 patent until after Glory demonstrated its S80 product to Cummins late in 1999. (*Id.* at 40-41). Glory contends that this delay was unreasonable and inexcusable and that it had committed large amounts of resources to the development of its products during the mean time. (*Id.* at 40, 42).

Cummins, in return, argues that prosecution laches is not applicable to the continuing patent application process without a showing of delay due to "gamesmanship." (Cummins Reply, p. 34). Cummins further claims that, in any case, prosecution laches does not apply to post-GATT patents, that Glory did not show unreasonable and inexcusable delay, and that there was no "meaningful" prejudice to Glory. (*Id.* at 36-42).

The Magistrate Judge rejected the argument that the doctrine of prosecution laches could not apply to post-GATT patents. (R & R, p. 75). The Magistrate Judge further found that Glory had raised a substantial question about the enforceability of the '806 patent and that Cummins had not shown that the defense lacked substantial merit. (*Id.* at p. 73-79).

This Court adopts the findings of the Magistrate Judge. Review of the relevant

31

case law leads to the conclusion that post-GATT patents and continuation patents may still be subject to prosecution laches. *Digital Control, Inc. v. McLaughlin Mfg. Co. Inc.*, 225 F. Supp. 2d 1224 (W.D. Wa. 2002); *Symbol Technologies, Inc.*, 277 F.3d 1361. While Cummins correctly notes that it does not bear the burden of proof to 'clearly establish that it would prevail' on each prong of the prosecution laches defense, it has also not shown that the Glory defense lacks substantial merit. (Cummins' Objections, p. 12, n. 88). Glory has raised a substantial question about why Cummins waited until 2000 to add claims potentially covering a multi-pocket unit (if, in fact, the claims cover such a unit). Therefore, at this preliminary stage, there remains an issue of fact regarding unreasonable and inexcusable delay that Cummins has not shown lacks substantial merit.

In sum, this Court adopts the Magistrate Judge's findings that Cummins' patent is likely to be found valid, as construed, although there may be issues or valid defenses if the patent is construed more broadly. This Court further adopts the Magistrate Judge's finding that Cummins has not proven that Glory's S60 and S80 products infringe upon its '806 patent, as construed. Therefore, Cummins has not shown that it is likely to prevail on the merits of the case, the first element necessary to obtain a preliminary injunction.

## II. IRREPARABLE HARM

The second element the patent holder must establish is that it will suffer irreparable harm if a preliminary injunction is not issued. *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 973 (Fed. Cir. 1996). According to case law, the patent holder is entitled to a rebuttable presumption of irreparable harm "by making a 'clear showing' of both validity and infringement." *Id.* (citing *Smith International, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed. Cir. 1983) *cert. denied*, 464 U.S. 996 (1983)). Although

32

Cummins agues that it has met its burden in relation to this presumption of irreparable harm, the Magistrate Judge found otherwise because Cummins did not make a clear showing of infringement. (R & R, p. 81). This Court agrees with the Magistrate Judge's findings.

In addition to claiming the presumption of irreparable harm, Cummins argues that it will suffer immediate and irreparable harm for four reasons: (1) loss of market share and profitability; (2) damages cannot be adequately determined because Cummins does not license its product; (3) concern over the ability to collect a judgment from Glory; and (4) loss of valuable employees. (Cummins' Support Memorandum, p. 9-12). In support of its first reason, Cummins argues that if the preliminary injunction is not granted, it will be forced to drop prices by 40% and will, in spite of the drastic price decrease, lose half the market to Glory. (Cummins Reply, Jones Sec. Dec., ¶ 7-8). This lower volume of sales, in turn, will result in a 20% increase in manufacturing cost as a result of higher material costs at the lower volume and fixed manufacturing costs being spread over a smaller number of units. (*Id.* at ¶ 10).

The Magistrate Judge, after reviewing the data presented by both parties, found no historical basis for Cummins claims of future irreparable financial harm. (R & R, p. 83). The record, instead, reveals that after the Glory S60 and S80 products were introduced in the marketplace in 1999, Cummins' sales continued to grow in 2000, dropped in 2001, but were projected to grow for 2002. (Cummins Reply, Bero Dec., Schedule 1). Moreover, Cummins own numbers show there has been a slight increase in the average selling price of the product and its gross margin since introduction of the Glory products. (Cummins Reply, Bero Dec., Schedules 11).

Notwithstanding these facts, Cummins argues that the historical record is not an accurate indication of the future situation because of Glory's history of engaging in predatory pricing, which practice Cummins claims will force it to drastically lower its prices in order to remain competitive and retain market share. (Cummins' Support Memorandum, p. 9-10). As proof of this practice, Cummins offers the fact that Glory products have a higher list price in Japan as compared to the average selling price in the United States and the fact that Glory, in the 1980's, significantly reduced the price of its automated coin wrapping machines. (Cummins Support Memorandum, Jones First Dec., ¶ 28,29). Further, as an indication that Glory intends to practice predatory pricing in this market, Cummins points to one transaction in May 2002 of Glory selling to Bank of America for a reduced price. (Cummins Support Memorandum, Jones First Dec., ¶¶ 31-32; Cummins Reply, Jones Sec. Dec., ¶¶ 19-21).

The Magistrate Judge properly determined that this information did not form a sound basis for claiming irreparable harm. (R & R, p. 84). As the Magistrate Judge concluded, the difference in list price in Japan as compared to the average selling price in the United States, without more information, is not an adequate comparison and cannot form the basis for a definitive conclusion. (*Id.*). It is, at minimum, debatable to compare list price to average selling price as multiple factors may be involved in the difference between the two numbers. Additionally, the information presented by Cummins regarding Glory's past behavior in relation to the automatic coin wrapper industry, while potentially a cause for concern, is not conclusive and does not rise to the level of proof needed to show immediate, irreparable harm. Glory's explanation for the behavior, a price reduction action taken by a distributor to move a discontinued model, is not

34

conclusive of predatory pricing. (Glory Memorandum, p. 49-50). Finally, Cummins offer of information about the Bank of America transaction is, as the Magistrate Judge correctly notes, only one transaction. (R & R, p. 85). Even in combination, the evidence presented by Cummins does not portray a history of or a tendency towards predatory pricing and, therefore, does not prove relief is needed to prevent irreparable harm.

Cummins' second argument regarding proof of irreparable harm is the claim that because it does not license its patent technology, damages cannot be adequately determined. (Cummins' Support Memorandum, p. 11). For support of this argument, Cummins uses the case of *Polymer Technologies*. *Polymer Techs.*, 103 F.3d at 973. The Magistrate Judge, however, correctly notes that Cummins' use of this case as support of its argument is misplaced. (R & R, p. 86-87). In *Polymer Technologies*, the district court gave the patent holder the presumption of irreparable harm without any prior finding regarding validity and infringement. (*Id.* at 973). On appeal, the Court explained that when the patent holder is allowed the presumption of irreparable harm, the burden is on the infringer to rebut that presumption. *Id.* at 974. The Court stated that one way of doing this is by showing that the patent holder is "willing to forgo its right to exclude by licensing the patent." *Id.* The Court, however, did not say the converse - that the patent holder has proven irreparable harm simply because it was unwilling to license its products. Thus, this Court agrees with Glory that a competent industry expert could be used to calculate reasonable damages. (Glory Memorandum, p. 53). Further, this Court agrees with the Magistrate Judge's finding that the fact that Cummins is not willing to license its patent does not establish irreparable harm.

This Court also agrees with the Magistrate Judge's finding that Cummins' third

reason, concern about the ability to collect a judgment from Glory, does not constitute irreparable harm. To address this concern, Glory Ltd, Glory's parent company in Japan, signed a Guaranty dated January 15, 2003, stating that it will guarantee payment of final judgment to Cummins. (Glory Supplementation Regarding Irreparable Harm, ¶1). The Guaranty specifically states that Cummins is the intended third-party beneficiary of the agreement and that Glory, Ltd. will not contest enforcement of any monetary judgment in Japan. (*Id.* at ¶¶ 3-4). This Court believes that this Guaranty, taken with the suggestion of the Magistrate Judge that "Glory, Ltd. should sign an amended Guaranty with Glory in which Glory, Ltd. specifically agrees not to contest enforcement in Japan of any judgment on the Guaranty (or a judgment by a United States court on the Guaranty) against Glory, Ltd., and will affirmatively assist Cummins enforcement of a judgment in Japan," should be adequate protection for Cummins. (R & R, p. 89). This is particularly so because Glory, Ltd. has already agreed to the Magistrate Judge's proposal and has submitted an Amended Guaranty. (Glory's Objections to R & R, p. 15, Attachment).

Finally, Cummins fourth reason that it will suffer irreparable harm is the loss of invaluable employees. (Cummins' Support Memorandum, p. 12). Cummins claims it will be forced to eliminate employees as a result of the projected decrease in sales volume and selling price. (*Id.*). Additionally, Cummins claims it will be unable to retain valued commissioned salesmen as the lower sales volume will result in an immediate drop in the salesmen's commissions. (*Id.*). Cummins further claims that, due to its projected poor financial results, it will not be able to pay bonuses, and, hence, will not be able to compete with large, publicly owned companies in recruiting top-rate professionals. (*Id.*). However, given the previous findings concerning the financial data,

36

Cummins' concerns in this regard appear to be speculative. While the dire estimates may be correct given the premise of a 50 percent decrease in sales and a 40 percent price reduction, Cummins did not adequately prove this premise. Therefore, the Court adopts the Magistrate Judge's findings that Cummins has not proven it will suffer irreparable harm if the preliminary injunction is not granted.

### III. BALANCE OF THE HARDSHIPS

The third factor in determining if a preliminary injunction should be issued requires the court to look at the balance of the hardships between the parties. *Hybritech*, 849 F.2d at 1457. The court must weigh the harm to the patent holder if the preliminary injunction is not issued against the harm to the alleged infringer if the injunction is incorrectly granted. *Id.* After reviewing the information presented, the Magistrate Judge found that the hardships did not favor granting the preliminary injunction. (R & R, p. 92). This Court holds that the findings of the Magistrate Judge are both logically and legally sound.

Cummins argues that the balance of hardships would tip in its favor by the fact that the JetScan products are "vital to Cummins' existence" while the Glory S60 and S80 constitute only a very small percentage of Glory's sales. (Cummins' Reply, p. 48-49). It also argues that because it employs more people in the United States than does Glory, it will suffer more hardship as a result of a loss of business than the smaller company if a preliminary injunction is not granted and that, in addition to its own employees, the employees of its U.S. suppliers would also be negatively impacted. (*Id.* at 49). Finally, Cummins claims that Glory made a calculated decision in introducing an infringing product into this country and 'thereby assumed[d] the risk of being put out of business by

37

the issuance of a preliminary injunction.' (*Id.*) (quoting *Jacobson v. Cox Paving Co.*, 19 U.S.P.Q.2d 1641, 1656-57 (D. Ariz. 1991) (holding that "those who take calculated risks should be well aware that they thereby assume the risk of being put out of that business by the issuance of a preliminary injunction").

Although this Court acknowledges that the JetScan products constitute a larger percentage of Cummins' business as compared the percentage for Glory's S60 and S80 products, that fact alone does not establish that the hardship tips in its favor. It only does so if the dire predictions of loss of sales and profit made by Cummins are true. Because Cummins has not sufficiently proven its negative economic forecast, it cannot use this same basis as an argument for balance of the hardships. This Court also agrees with the Magistrate Judge's findings that having more U.S. employees could actually mean that Cummins is in a better position to withstand a loss of business. (R & R, p. 92). Finally, this Court adopts the logic of the Magistrate Judge's arguments concerning Cummins' claim that Glory should not be allowed to argue hardship because it knowingly introduced infringing products into the market. (*Id.* at 93). Because this Court does not agree that it is a foregone conclusion that the Glory products infringe the '806 patent, much less that Glory knew this at the time they were introduced into the United States, it does not find this argument persuasive. In sum, this Court finds that the balance of hardships does not clearly favor one party over another and is not conclusive.

## IV.  IMPACT ON THE PUBLIC INTEREST

The final factor a court should consider in determining whether to issue a preliminary injunction is the impact on the public interest. *Hybritech*, 849 F.2d at 1458. "[I]n a patent infringement case, although there exists a public interest in protecting rights secured by valid patents, the focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Id.*

Cummins claims that the public interest factor weighs in its favor due to the strong interest in protecting the rights of patent holders and the fact that no other critical public interest would be harmed. (Cummins Support Memorandum, p. 13). Specifically, Cummins claims there will be no harm to the public interest due to the deprivation of an innovative product because its own product would still be on the market. (*Id.* at 14). Additionally, Cummins argues that because it employs more people in the United States and pays more U.S. taxes than Glory and that several U.S. government agencies rely on the Cummins' product to aid in the fight against counterfeiting, the public interest factor weighs in its favor. (Cummins Reply, p. 50). Glory counters this by arguing that there is a countervailing public interest in promoting competition. (Glory Memorandum, p. 56). Glory further claims that Cummins' "strategy [is] aimed at monopolizing the market in order to eliminate competition and preserve its ability to charge artificially inflated, monopoly prices for products of inferior design and functionality." (*Id.*).

The Magistrate Judge found that the public interest factors did not weigh in Cummins' favor due to the countervailing public interest in competition. This Court adopts the findings of the Magistrate Judge. Cummins' arguments were unpersuasive in

light of the fact that it did not make a clear showing of likelihood of success on infringement.

## CONCLUSION

This Court, in undertaking its *de novo* review, has addressed the objections of the parties where possible and relevant to the analysis. However, it was not possible to address Cummins' objection numbers 4, 10, 13, 15, 21, 23, 26, 31, 38-43, 59, 64-67 and 75 because they were extremely vague and offered no insight into the issues. Almost all of the objections simply stated "[t]he Magistrate Judge erroneously found . . ." with little to no explanation as to why the conclusion was erroneous or without factual argument to support the objection. This Court is in no position to speculate as to what the objection basis may be and, therefore, these objections are overruled. This Court adopts the recommendation of the Magistrate Judge denying Cummins' motion for a preliminary injunction. Cummins did not make a clear showing of either likelihood of success on the merits or irreparable harm, the two factors absolutely necessary for granting the extraordinary relief of a preliminary injunction. Further, although not dispositive, Cummins was not able to show that the balance of hardships or public interest weighed in favor of granting the motion.

**SO ORDERED.**

ENTERED: *Ronald A. Guzman*

Ronald A. Guzman
United States Judge

DATE *Sept. 23*, 2003