IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CUMMINS-ALLISON CORP., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 02 C 7008 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| GLORY LTD., GLORY SHOJI CO., LTD., and GLORY (U.S.A.), INC., | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

Plaintiff Cummins-Allison Corp. ("Cummins") has sued Defendants Glory Ltd., Glory Shoji Co., Ltd., and Glory (U.S.A.), Inc. ("Glory"), for infringement of two of Cummins's patents, the 5,295,196 (the "196 Patent") and the 6,459,806 (the "806 Patent"). Cummins moved this Court to reconsider the March 28, 2005 Opinion and Order construing the claims of the '196 Patent. Simultaneously, Glory moved this Court to reconsider the March 28, 2005 Opinion and order construing one of the claims of the '806 Patent. The Court vacated the March 28, 2005 order construing the claims of the '196 Patent, and held hearings on the construction of the claims of both patents on July 14 and 17, 2006. The Court's construction of the claims of the '196 Patent are set forth below. The Court does not change the previous ruling on the '806 Patent.

Procedural History

The facts leading to this suit have been described in detail in the prior memoranda and opinions published in this case.[1] In summary, Cummins and Glory each manufacture machines that

---

[1]At that time, the case was assigned to a different judge in this district. On January 23, 2006, the case transferred to the present judge as part of the Executive Order creating the judge's

sort and count currency. Cummins holds several patents for currency sorting and denominating machines, among them the '196 and '806 Patents. On the date that the '806 Patent issued from the Patent and Trademark Office, Cummins filed suit against Glory for infringement of numerous claims in both the '196 and the '806 Patents.

In late 2004, Glory moved for summary judgment that it had not infringed either of the patents at suit. Glory reasoned that when the disputed claims in each of the patents are properly construed Glory's machines do not infringe on Cummins' machines. The court denied the parties' request to hold a Markman hearing on claim construction for either of the two Patents. The court ruled on both summary judgment motions in two separate memorandum opinions, both issued on March 28, 2006 (hereafter the " '196 Opinion" and the " '806 Opinion").

In June 2005, Cummins moved to reconsider the court's decision with respect to the construction of the '196 Patent claims. Specifically, Cummins argued as a matter of law that the court inappropriately relied upon the specification of a subsequent patent in order to construe the claim "central portion." Cummins argued that reliance upon a subsequent patent is inappropriate and a misstatement of the Federal Circuit's holding in *Microsoft v. Multitech Sys. Inc.*, 357 F.3d 1340 (Fed. Cir. 2004). After hearing oral argument on the motion in April 2006, the Court determined that it would hold a Markman hearing on claim construction for the '196 Patent. Out of deference to Glory, which did not move to reconsider any portions of the '196 Opinion, the Court vacated the '196 Opinion in its entirety and requested that the parties rebrief all claims construction in the '196 Patent and prepare expert testimony as extrinsic evidence.

---

initial calendar.

Also in June 2005, Glory moved to reconsider the court's decision with respect to the construction of the claims in the '806 Patent. Specifically, Glory argued that the court erred as a matter of law when it determined that the phrase "automatically denominating" is not a means-plus function and is therefore not subject to the constraints of 35 U.S.C. § 112, ¶ 6. Because "automatically denominating" is the end result of a number of steps, argued Glory, it must be a "function" and fall within the confines of ¶ 6 of § 112. At oral argument on the motion in April 2006, Glory also argued that a Federal Circuit case published subsequent to the '806 Opinion, *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005), should further influence the Court to permit reconsideration. After review of the motion and the *Phillips* decision, the Court denied Glory's motion for reconsideration. After setting the Markman hearing for the '196 Patent, however, the Court agreed to hear additional expert testimony with respect to the '806 Patent at the same hearing.

The parties submitted a joint claim construction chart and briefed claim construction of both Patents. The Court held a Markman hearing on both Patents on July 14 and 17, 2006.

## DISCUSSION

### I. Legal Standard

In order to determine whether a patent is infringed, the court must conduct a two-step process. First, the court construes the claims of the patent or patents at issue. Then, the court compares the allegedly infringing product with the patented product in order to determine whether summary judgment may be granted on the issue of infringement. *Crystal Semi-Conductor Corp. v. TriTech Microelectronics Int'l*, 246 F.3d 1336, 1345 (Fed. Cir. 2001). An accused device infringes if it meets each claim limitation, either literally or under the doctrine of equivalents. *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1273 (Fed. Cir. 2004).

3

To determine the proper construction of a patent's claims, the court must first look to the intrinsic evidence of a patent - the claims, the specification, and the prosecution history. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Only if the intrinsic evidence is insufficient to construe a claim may a court turn to extrinsic evidence, such as expert testimony. *Id.* at 1584. The words of a claim "are generally given their ordinary and customary meaning" that the "term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312-13. Persons of ordinary skill in the art are deemed to read claim terms not in isolation, but rather in the context of everything in the patent, including the specification. *Id.* at 1313.

## II. Construction of Claims in the '196 Patent

The parties dispute terms in claims 1, 3, 6, 8, 9, 10, 11, 13, 16, and 18 in the '196 Patent. The court need only construe the independent claim, claim 1, which contains all disputed claims. *See Wahpeton Canvas Co., Inc. v. Frontier, Inc.*, 870 F.2d 1546, 1552 n.9 (Fed. Cir. 1989) ("One who does not infringe an independent claim cannot infringe a claim dependent on and thus containing all the limitations of that claim."). The Court addresses each of the disputed claim terms in turn.

### *A. Central Portion*

The phrase "central portion" of a bill, present in claim 1 and in many of the dependent claims, formed the basis for Cummins' motion to reconsider the '196 Opinion. In relevant part, the '196 Patent claim 1 describes scanning "a preselected segment of a central portion of each bill."

Cummins argues that "central portion" is a vertical part of a whole portion of U.S. currency, approximately 2 inches in length, located between the borderlines of the bill and which contains

preselected segment consisting of critical indicia scanned to determine the bill's denomination, and that there may be more than one central portion on the bill. Cummins Opening Brief at 13. Glory argues that the "central portion" of the bill is at or near the geometric center of the bill.

In the '196 Opinion, the court agreed with Glory. The court found that while the patent specification and the patent prosecution history did not assist the court in construing the claim, the patent prosecution history of a subsequent patent provided guidance to construe the claim in the earlier '196 Patent. On the basis of *Microsoft v. Multitech Sys. Inc.*, 357 F.3d 1340 (Fed. Cir. 2004), the court determined that it could rely upon the language of the specification in a later patent as intrinsic evidence that could shed light on the appropriate construction of the claim language in an earlier patent. On reconsideration, the Court finds that the '196 Opinion was correct, and that the "central portion" in claim 1 is limited to the geometric center of the bill.

### 1. Claim Language

The disputed language from claim 1 reads as follows: "a stationery optical scanning head located between said feed and stacking stations for scanning a preselected segment of a central portion of each bill. . ." '196 Patent, Col. 31, ll. 55-60. Glory asks this Court to construe the claim such that the "central portion" from which the "preselected segment" is taken is at the "geometric center" of the bill.

Claim 1 describes not <u>one</u> predetermined segment or <u>one</u> central portion, but "<u>a</u> predetermined segment" in "<u>a</u> central portion" of the bill. Standing alone, a claim containing the article "a" or "an" means "at least one." *See Crystal Semiconductor Corp.*, 246 F.3d at 1347. Glory correctly states that the use of the phrase "<u>said</u> predetermined segment of a bill" later in claim 1 implies one predetermined segment per type of bill, but that does not necessarily lead to an

5

inference that the preselected segment for the bill must be at the geometric center of the bill. The use of "said predetermined segment" alone does not limit the central portion to the geometric center of the bill.

Cummins also points to the existence of dependent claim 8 as support that "central portion" does not limit the scanned segment solely to the geometric center of the bill. The context of the surrounding words in a claim must be considered in determining the ordinary and customary meaning of a term. *See ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003). One such context is the presence of a dependent claim adding a particular limitation, which "gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1314-15; *see also Wenger Mfg., Inc. v. Coating Mach. Sys.* 239 F.3d 1225, 1233 (Fed. Cir. 2001). Claim 8 describes: "The currency counting and evaluation device of claim 1 wherein said preselected segment of each bill is located in the central region of the bill." '196 Patent, Col. 32, Claim 8. If a dependent claim provides an additional limitation of a more specific location for a preselected segment, it can be inferred that the independent claim 1 does not provide such a limitation on location. Otherwise, claim 8 would become superfluous. The use of "central region" in claim 8 implies that there is a subset of "central portion" that is the "central region." Unfortunately, this claim alone does not clarify the relative size of either of these terms in relation to the size of the bill. The claim language, standing alone, does not allow the Court to determine the meaning of "central portion."

### 2. Specification

A person of ordinary skill in the art reads a claim term not only in the context of a claim, but also in the context of the patent and its specification. *Phillips*, 415 F.3d at 1313. In reviewing the

specification of the '196 Patent, the Court finds that the specification is ambiguous. Both parties have focused on one area of the specification discussing the "central portion":

> In the case of U.S. currency, for instance, it has been determined that the central, approximately two-inch portion of currency bills, as scanned across the central section of the narrow dimension of the bill, provides sufficient data for distinguishing among the various U.S. currency denominations on the basis of the correlation technique used in this invention. Accordingly, the optical encoder can be used to control the scanning process so that reflectance samples are taken for a set period of time and only after a certain period of time has elapsed since the borderline has been detected, thereby restricting the scanning to the desired central portion of the narrow dimension of the bill.

'196 Patent Col. 7 ll. 29-42. Glory argues that this section suggests that the patent is limited to the two-inch portion that is at the center of the bill. Glory Const. Br. at 2. But the specification describes the central portion as approximately two inches "as scanned across the <u>central section</u> of the narrow dimension." That implies that the central portion is either in a different direction from, or a subset of, the central section, but does not give a sense of whether that is necessarily at or around the geometric center.

In the paragraph preceding the above-quoted text, the specification explains why the "central, two-inch portion" is important - because the distance between the borderlines of U.S. currency are "an absolute reference point" approximately two-inches apart, while the distance between the borderline and the actual edge of the bill may differ from bill to bill "due to the relatively large range of tolerances permitted during printing and cutting of currency bills." Col. 7 ll. 5-17. This explanation clarifies that the "central portion" is a narrow strip measured between the borderlines of the narrow dimension of the bill, while "central section" defines where on the horizontal dimension of the bill the machine will scan.

7

Glory relies upon the drawings accompanying the patent's specification as evidence that the patent holders intended that the invention scan only the geometric center of the bills. It is true that the figures accompanying the patent's preferred embodiment depict scanning in the geometric center of the bill. A preferred embodiment, however, is just that – a preference. *See Texas Instruments, Inc. v. United States Int'l Trade Comm'n,* 805 F.2d 1558, 1563 (Fed. Cir. 1986) ("This court has cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification."). While a claim cannot be construed as something that is *excluded* by the language of the specification, the specification - like the claim language - does not necessarily lead to a conclusion about the meaning of "central portion."

### 3. Prosecution and Subsequent Patents

Finally, while neither party relies upon the prosecution history of the '196 Patent to support claim construction, Glory argues - and the '196 Opinion agreed - that the Court could consider the specification of a subsequent, continuation-in-part patent to in interpreting the meaning of terms in the '196 Patent. The subsequent patent, No. 6,381,354 (the " '354 Patent") covers currency counting devices for foreign bills, and states in relevant part:

> In adapting. . . U.S. Patent No. 5,295,196 to optimize the scanning of currencies from countries other than the United States, it is first noted that while it has been found that scanning along the central portion of the green side of U.S. bills provides good patterns to discriminate between the different U.S. denominations, foreign bills may require scanning along segments located in locations other than the center. . . it may be . . . desirable to scan German marks. . . along a segment 1 inch (2.54 cm) to the left of center along the top face of a bill while it may be desirable to scan British pounds along a segment 1.5 inches (3.81 cm) to the right of center.

'354 Patent, col. 9, ll. 48-62.

The '196 Opinion relied upon the recent opinion from the Federal Circuit, *Microsoft Corp. v. Multi-Tech Systems* to draw an inference that the language in the 354 Patent limited the claims of

8

the '196 Patent to the "geometric center". In *Microsoft,* the Federal Circuit reviewed statements made during the prosecution of a subsequent, related patent in construing the claims of an earlier patent. *Microsoft*, 357 F.3d at 1349-50. Glory suggests that the statements about the '196 Patent made in the specification of the '354 Patent can be used to interpret the terms of the '196 Patent. Cummins urges this Court to discredit all arguments using *Microsoft* because that case relied upon the prosecution history of a subsequent patent in which the patent specification was identical to the specification of the earlier patent, and is therefore distinguishable from the patents at issue in this case.

It is the statement about the '196 Patent in the '354 Patent specification that convinces this Court that the term "central portion" means at or near the geometric center of the bill. As Cummins points out, the facts of this case can be distinguished from those in *Microsoft* because the relevant statement is in the specification rather than the PTO prosecution. But the *Microsoft* court's logic - that a patentee's considered statement about the scope of an earlier patent in an official proceeding on a later patent is relevant to determining the scope of the earlier patent - applies with equal, if not more, force to statements made in a later specification. Unlike a statement before the PTO, made in order to get the PTO to accept an application, a specification is directed to all practitioners skilled in the art in the field. 35 U.S.C. § 112. Thus, the patentee has even more incentive to "exercise care in characterizing the scope of its invention" in a subsequent specification as it does when describing an earlier invention during prosecution. *Microsoft*, 357 F.3d at 1350. The fact that Cummins described the '196 Patent as scanning the center in the specification rather than in prosecution proceedings does not render the description irrelevant to construing the scope of the '196 Claims.

The *Microsoft* case's holding also does not hinge on the fact that the specifications of the two patents in that case were identical. The court's conclusion that "any statement of the patentee in the prosecution of a related application as to the scope of the invention [is] relevant to claim construction" does not rely upon identical specifications. *Id.* at 1350. Moreover, the body of precedent in *Microsoft* relied upon *Jonsson v. Stanley Works*, 903 F.2d 812 (Fed. Cir. 1990) and *Wang Labs., Inc. v. America Online, Inc.*, 197 F.3d 1377 (Fed. Cir. 1999), both of which used the prosecution histories of Continuation-in-Part patents. Neither of those cases relied upon the existence of common specifications, but rather relied upon the existence of common subject matter.

Finally, the purpose served in the *Microsoft* holding by the common specification is not present in this case. In the usual case, the term in a related patent with identical specification is used as an inference that the patent holder intended the two terms to have the same meaning. In this case no inference is required, because the patent holder directly described the term "central portion" in the '196 Patent as being in the center, and distinguished the continuation-in-part '354 Patent because it would cover devices that scan "along segments located in sections *other than the center*." In the face of that direct evidence, the circumstantial inference that would be drawn from a common specification is not necessary.

Therefore, the Court finds that the term "central portion" as used in the '196 Patent means scanning at or near the geometric center of the bill.

### B. About 800 Bills per Minute

The parties dispute the meaning of the phrase "about" in the phrase "at a rate in excess of about 800 bills per minute" in claim 1 and subsequent claims. Cummins argues that the phrase "about" should be given its ordinary meaning of "approximately." Glory argues that the phrase

"about" is not given a specific definition in the specification, prior art, prosecution history, or any other source, and should therefore be invalid. In the alternative, Glory argues that it should be read as "plus or minus a tolerance."

In some cases, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. The Court does not see any meaningful distinction between construing the phrase as "approximately" or "plus or minus a tolerance." Either explanation is consistent with a layperson's understanding of the term "about" in the phrase "about 800 bills per minute." The Court determines the phrase "about" to mean "approximately."

### C. Means for Sampling

Both parties agree that the phrase "means for sampling" in Claim 1 denotes a means-plus function format, and that the Court should construe this portion of the claim pursuant to 35 U.S.C. § 112 ¶ 6. The relevant portion of claim 1 is:

> means for sampling said output signal at preselected intervals as a bill is moved across said scanning head in the direction of the narrow dimension of the bill, each of said output signal samples being proportional to the intensity of the light reflected from a different strip of said preselected segment of a bill. . .

'196 Patent, Col. 31, ll. 65 *et seq.* "When construing the functional statement in a means-plus-function limitation, we must take great care not to impermissibly limit the function by adopting a function different from that explicitly recited in the claim." *Generation II Orthotics, Inc. v. Medical Tech., Inc.*, 263 F.3d 1356, 1364-65 (Fed. Cir. 2001) *citing Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999). A means-plus-function claim covers only the

11

corresponding step or structure that is specifically disclosed in the written description and that step or structure's equivalents. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002). Likewise, once the function has been determined, the structure is limited to that required to perform the specified function. *See Asyst Tech. Inc. v. Empak, Inc.*, 268 F.3d 1364, 1370 (Fed. Cir. 2001) ("Structural features that do not actually perform the recited function do not constitute corresponding structure and thus do not serve as claim limitations.")

The "means for sampling" portion of Claim 1 details a function in the above section, and the specification articulates a structure for performing that function: an A/D converter (28) to digitize the output signal, and a CPU (30) programmed to read the output. Glory both objects to this function and proposes a more complicated structure but provides the Court with insufficient basis for its position. In light of case precedent to construe means-plus functions no further than the structure required to perform the specified function, the Court agrees with Cummins that the function is as described in the claim, and the structure the minimum required: an A/D converter (28) and a CPU (30).[2]

### D. Said Scanning Head

The parties dispute whether the scanning head that samples the output signals must also produce or generate the characteristic signal samples that it uses for comparison. The relevant portion of claim 1 states: "a memory for storing characteristic signal samples produced by scanning said preselected segments of bills of different denominations with <u>said scanning head</u>." '196 Patent,

---

[2]Although the Court has not relied upon the opinion of the Texas court hearing parallel litigation on other patents related to these patents, in this instance the Court did note that Glory appears to have changed its position with respect to this claim since the first claims construction briefs filed before this court and since the time of the Texas court's claim construction hearing.

Col. 32, ll.5-8. Glory argues that the characteristic signal samples must be produced and stored by the specific scanning head that is present in the device. Cummins argues that such a construction is improperly narrow, and that the scanning head need only have a memory for storing the signal samples.

The Court agrees with Glory's proposed construction. The use of "<u>said</u> scanning head" is a reference to a term of art in patent law in which the court must identify the antecedent basis for an element preceded by "said." *See Gemstar-TV Guide Intern., Inc. v. Int'l Trade Comm'n.*, 383 F.3d 1352, 1379 (Fed. Cir. 2004). The "scanning head" is a specific, defined element in Claim 1; therefore, the plain language of the claim requires the characteristic signal samples to be produced and stored by that particular scanning head. Cummins could have drafted this claim differently so as to allow the scanning head to receive pre-programmed characteristic signal samples, but Cummins did not draft the claim in such a way. Courts may not redraft the plain language of a claim. *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004). The language of the claim requires the patented device to produce and store the master characteristic patterns.

### *E. Signal Processing Means*

The parties agree that the portion of claim 1 starting with "signal processing means" is a means-plus-function limitation that should be construed pursuant to 35 U.S.C. § 112 ¶ 6. The parties agree that the function of the term as described in the verbatim language of the claim, "signal processing means for receiving said signal samples and (1) determining the denomination of each scanned bill by comparing said stored signal samples with said output signal samples produced by the scanning of each bill with said scanning head; (2) counting the number of scanned bills of each denomination; and (3) accumulating the cumulative value of the scanned bills of each

denomination." '196 Patent, Col. 32, ll. 13-21. The parties also agree on the structure for this function: "a CPU programmed to carry out the correlation algorithm disclosed in the specification to compare the scanned signal samples, or scanned patterns, from the unknown bills with the stored master characteristic patterns." *See* Cummins Cl. Const. Br. at 18; Glory Claim Constr. Br. at 12.

Glory has added an additional term for construction in its claim construction brief - "said output signal" - and argues that this term should be construed as digitalized and normalized samples. This new term appears to relate to Glory's arguments raised with respect to the construction of the structure in the "means for sampling" claim. Glory points to no support in the claims or the specification the limits "said output signal" to digitalized, normalized, or proportional to the intensity of the light as suggested by Glory. As with the Court's decision with respect to "means for sampling," the Court declines to place the limitations requested by Glory.

### *F. Evaluating*

The preamble of claim 1 of the '196 Patent discloses 'a currency counting and evaluation device for receiving a stack of currency bills, rapidly counting and <u>evaluating</u> all the bills in the stack and then re-stacking the bills. . ." '196 Patent, Col. 31, ll. 41-46. Cummins argues that as a word in the preamble, the word "evaluating" should not be given any specific limiting meaning. To the extent it requires limitation, however, Cummins argues that the dictionary meaning of "evaluating" is synonymous with "denominating." Glory argues that this word means both the evaluation of the value of the bill and the evaluation of the genuine vs. counterfeit bills. The parties agree that any construction of "evaluating" applies to both the '196 Patent and the '806 Patent.

While the word "evaluation" appears only in the preamble of claim 1 of the '196 Patent, the claims of the '806 Patent provide more guidance. The '806 Patent use both "evaluate" and

14

"denominating" in the same independent claim, claim 16. When two terms are used together in the same claim, they are presumed to have different meanings. *Bancorp Services, L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1373 (Fed. Cir. 2004) (use of two terms in "close proximity in the same claim gives rise to an inference that a different meaning should be assigned to each"). Glory's position is consistent with this principle. Additionally, Cummins has claimed a patent for a machine that both (i) determines whether a bill is genuine or spurious, and (ii) attaches a denomination to those bills that the machine finds to be genuine. Given the presence of these two functions, the Court agrees with Glory that "evaluating" encompasses determining for each bill whether that bill's value can be determined.

### III. Construing the Claims of the '806 Patent

The parties dispute the construction of claims 16, 17-21, 23–25, 29-30, 32-34, 38-40, 42-43, 47-51, 53-54, 76-78, 81-85, 89, 91-95, 99-101, 103, 105, 108, 111-114, 120, 123-124, and 133 in the '806 Patent. In late 2005, Glory moved for reconsideration of the '806 Opinion. The Court denied the motion for reconsideration in April 2006. The Court did, however, agree to allow Glory to argue the claims construction on the '806 Patent as part of the Markman hearings in July.

The parties dispute the claims "evaluating," and "about 800 bills per minute," both of which have already been construed above. The only other term the parties dispute is "automatically denominating." Having fully reviewed the parties' briefs on the motion for reconsideration and the briefs on claim construction for the '806 Patent, and having heard testimony on the term "automatically denominating" at the Markman hearing, the Court affirms the '806 Opinion.

In Glory's late 2005 motion for reconsideration, in the second half of its claim construction brief before this Court, and in argument during the Markman hearing, Glory relies primarily on recent cases from the Federal Circuit that Glory believes invalidate the reasoning of the '806 Opinion. Glory cites to *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) and *Honeywell Int'l, Inc. v. ITT Industrials, Inc.*, 452 F.3d 1312 (Fed. Cir. 2006) to support its argument that the '806 Opinion erroneously relied too little upon the terms of the specification, and relies upon *Curtiss-Wright Flow Control Corp. v. Velan, Inc.* 438 F.3d 1374 (Fed. Cir. 2006) to support its argument that an inventor cannot claim prior art specifically disclaimed in its specification. While the Court respects Glory's arguments that the specification discusses the "optical sensing and correlation technique" that halts whenever a "no-call" bill is discovered, none of the cases cited by Glory refute the basic principles that a court should not import everything in the specification into the claims, or the basic principle of claim differentiation. *See Phillips*, 415 F.3d at 1315 ("The presence of a dependent claim that adds a particular limitation give rise to a presumption that the limitation in question is not present in the independent claim;"); *Varco, L.P. v. Pason Systems USA Corp.*, 436 F.3d 1368, 1372 (Fed. Cir. 2006) ("In examining the specification for proper context, however, this court will not at any time import limitations from the specification into the claims."). The '806 Opinion explained why "automatically denominating" could not be limited to the specific correlation technique with halting function suggested by Glory because the dependent claims of the '806 Patent describe specific limitations on "automatically denominating" and "denominating," creating the inference that the independent claims may not be so limited. '806 Opinion at 11-13. Additionally, as stated in the '806 Opinion, Glory's own expert testified that correlation algorithms as well as various other denomination techniques were "known to and understood by those in the art well

before 1999." '806 Opinion at 15. Therefore, the Court agrees with the '806 Opinion that "automatically denominating" includes any method for automatic denomination known to those skilled in the art at the time the '806 Patent was filed.

## Conclusion

For the foregoing reasons, the Court construes the claims of the '196 Patent, and does not change the conclusions of the previous opinion with respect to the '806 Patent. So ordered.

 _____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: October 13, 2006