# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| CUMMINS-ALLISON CORP., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 02 C 7008 |
| v. | ) | |
| GLORY LTD., GLORY SHOJI CO., LTD., and | ) | Judge Virginia M. Kendall |
| GLORY (U.S.A.), INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Cummins-Allison Corp. ("Cummins") has sued Glory Ltd. and its affiliate organizations ("Glory") for patent infringement of its U.S. Patents Nos. 5,285,196 ("the '196 Patent") and 6,459,806 ("the '806 Patent"). Glory moves for summary judgment on grounds that both patents are invalid because the patent applications failed to comply with 35 U.S.C. § 102(b). Because Glory has not shown by clear and convincing evidence that the public use was not experimental, Glory's Motion for Summary Judgment Declaring the Patents in Suit Invalid Under 35 U.S.C. § 102(b) for Public Use is denied.

### Statement of Facts

Cummins is a corporation based in Indiana and Illinois; Glory Ltd. is a Japanese corporation, while Glory (U.S.A.), Inc. is a California Corporation. Cummins' Response to Glory's Statement of Material Facts (hereafter "Cummins Resp.") at ¶¶ 1-2. Glory has designed, manufactured, and marketed money-handling equipment of various forms, including desk-top devices for currency counting and currency discrimination. *Id.* at ¶ 3. Cummins holds several patents for desk-top

currency counting and discrimination devices, two of which are the '196 Patent and the '806 Patent. *Id.* at ¶ 4. Both the '196 and the '806 Patents were effectively filed May 19, 1992. *Id.* at ¶ 7.

In 1985, Cummins requested a proposal from Aaron Bauch regarding correlation algorithms that were capable of accurately denominating U.S. currency. *Id.* at ¶ 8. By August 1986, Cummins had built a prototype circuit board for its Currency Recognition Unit ("CRU"). *Id.* at ¶ 9. By September 1990, Cummins had built and tested a laboratory model of the CRU. *Id.* at ¶ 11. By the end of 1990, Cummins had built two prototype CRUs. *Id.* at ¶ 15. On January 15, 1991, Cummins conducted an in-house test of its two prototype CRUs, operated by a professional teller from Glenview State Bank. *Id.* at ¶ 17. The machines operated in two modes: the "read" mode and the "stranger" mode. The parties dispute the extent of the problems that these two prototype machines exhibited in each of the modes during testing, and whether one or both modes exhibited significant or minor rates of error. *Id.* at ¶¶ 11, 13, 15, 16.

On January 21, 1991, Cummins ran a test of its CRU machines at Glenview State Bank. *Id.* at ¶ 20. By January 23, 1991, Cummins had decided to build twenty more machines, five in February 1991, and five in April 1991. *Id.* at ¶ 23. Cummins conducted additional tests on the two prototypes on January 29, 1991. *Id*. at ¶¶ 25-27. By January 31, 1991, an internal Cummins' memo indicated that at least one patent application involving the CRU was ready for filing; Cummins claims that this memo concerned a different patent than the patents-in-suit. *Id.* at ¶ 28. On February 28, 1991, an internal Cummins' memo stated that Cummins planned to produce the discriminator starting July 1, 1991; Cummins' head of the CRU development project, Douglas Mennie, testified that the February 28, 1991 memo set goals rather than deadlines. *Id.* at ¶ 31.

2

Between February and April of 1991, Cummins installed CRU "beta-test" machines at four locations. *Id.* at ¶ 32. Employees at the four locations testified that the machines worked with little or no problems, while employees from Cummins who witnessed the on-site testing testified that the tests were not considered routinely successful. *Id.* at ¶ 33. The parties dispute whether visitors could view the machines on location in operation. *Id.* at ¶ 34. Cummins employees were instructed to speak with the responsible persons at each test site and explain the need for confidentiality concerning each of the testing machines, but Cummins does not have signed confidentiality agreements from any of the sites. *Id.* at ¶ 38.

Cummins and Glory dispute the import of the testimony of several employees from the on-site locations where the CRC machines were tested. These employees from the locations testified that they believed the machines were being tested for purchase, were on-site for commercial use, or were already part of ordinary operations at the commercial location. *Id.* at ¶¶ 39-43. Some employees from the locations testified that they were not aware of confidentiality restrictions on the machines' use at the time they were on location. Finally, some employees testified that the machines were left unattended, moved from their original locations, or used by untrained personnel - cited by Glory as evidence that Cummins lacked control of its machines while they were on location. *Id.* at ¶¶ 47-52. Cummins disputes both the accuracy of the employees' memory and provides documentation and testimony from its employee, Per Torling, an inspector monitoring the on-site beta testing, who disputes the on-site employees' testimony. *Id; see Adli Decl. Ex. 17* (Decl. of Per Torling).

Standard of Review

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court, however, will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. Of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. *See Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted."). An adequate rebuttal requires a citation to specific support in the record, an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001).

Discussion

Title 35 of the United States Code, Section 102(b) bars a person from acquiring a patent if "the invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." A patentee loses its right to patent an invention if it fails to file a patent application within one year of the date that an invention is both: (1) "ready

for patenting;" and (2) "in public use" or "on sale." *See* 35 U.S.C. § 102(b), *explained in Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 60 (1998). In the context of public use, "evidence of experimental use may negate either the 'ready for patenting' or 'public use' prong." *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1379-80 (Fed. Cir. 2005). In this case, the "Critical Date" for purposes of the public use bar is May 19, 1991, one year prior to the agreed date on which Cummins filed its applications for the '196 and '806 Patents.

Whether a patent is invalid on grounds of public use is a question of law based on the underlying facts. *Netscape Communications Corp. v. Konrad*, 295 F.3d 1315, 1320 (Fed. Cir. 2002). "A patent is presumed valid. Overcoming the presumption requires a showing of facts proved by clear and convincing evidence." *Invitrogen*, 424 F.3d at 1378 (internal citations omitted); *see also Finnigan Corp. v. Int'l Trade Comm.*, 180 F.3d 1354, 1365 (Fed. Cir. 1999) ("The burden is on the party asserting invalidity to prove it with facts supported by clear and convincing evidence.").

Public Use

As recently clarified by the Federal Circuit in *Invitrogen Corp.*, the proper test for the public use prong of the bar set forth in 35 U.S.C. § 102(b) is "whether the purported use: (1) was accessible to the public; or (2) was commercially exploited." *Invitrogen,* 424 F.3d at 1380. The test for public use includes consideration of evidence indicating experimentation as well as evidence about the nature of the activity that occurred in public and the degree of confidentiality. *Id.* "The statutory phrase 'public use' does not necessarily mean open and visible in the ordinary sense; it includes any use of the claimed invention by a person other than the inventor who is under no limitation, restriction, or obligation of secrecy to the inventor." *New Railhead Mfg. L.L.C. v. Vermeer Mfg. Co.,*

5

298 F.3d 1290, 1297 (Fed. Cir. 2002); *accord Eli Lilly v. Zenith Goldline Pharmaceutical, Inc.*, 471 F.3d 1369, 1380-81 (Fed. Cir. 2006).

In this case, Glory has presented the oral testimony of three witnesses who worked at the on-site locations to support its position that the CRU machines were in public use prior to the Critical Date. *See Adli Decl. at* Ex. 19-23. The employees testified that the CRUs were visible to non-employees and were used by employees who had not been trained by Cummins. The Federal Circuit cautions that the uncorroborated oral testimony of disinterested witnesses whose memories have been prodded by an interested party rarely rises to the level of "clear and convincing evidence" of invalidity. *See Finnigan,* 180 F.3d at 1367 (testimony of uninterested witness regarding prior public use insufficient to grant summary judgment of invalidity for prior public use); *affirming The Barbed Wire Patent*, 143 U.S. 275, 284 (1882) (twenty-four corroborated witnesses insufficient where "witnesses whose memories are prodded by the eagerness of interested parties to elicit testimony favorable to themselves are not usually depended upon for accurate information"). While few other areas of federal law require this level of corroboration, the precedent of *Finnegan* which requires this higher level of corroboration been cited favorably by subsequent cases. *See Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 737- 737-38 (Fed. Cir. 2002) (adopting *Barbed Wire* and discussing the factors to consider when evaluating oral testimony); *Engate, Inc. v. Esquire Deposition Svcs., LLC*, 331 F. Supp. 2d 673 (N.D. Ill. 2004) (discussing whether *Finnegan*'s "strong version of the corroboration requirement" should remain good law but following binding case precedent).

In this case, the testimony of the on-site employees about the public nature of the beta testing, while not corroborated by documentary evidence, is corroborated by the absence of written

confidentiality agreements. *See Invitrogen*, 424 F.3d at 1380 (degree of confidentiality one factor in evaluating public use). Cummins admits that it asked the employees at the on-site testing locations to sign confidentiality agreements and that the locations did not sign the agreements. Internal memoranda from Cummins, and the testimony of Cummins' employees indicates that Cummins instructed employees at each of the locations that the machines were to be kep confidential. The testimony and internal documents of Cummins counter the oral testimony of the on-site employee witnesses sufficient to create a genuine issue of material fact as to whether the CRU was in public use prior to the Critical Date.

## Reduction to Practice / Experimental Use

In the two-part test for the "public use or on sale" statutory bar, "ready for patenting" may be shown by proof of "reduction to practice" prior to the critical date. *See EZ Dock, Inc. v. Schafer Sys., Inc.*, 276 F.3d 1347, 1347 (Fed. Cir. 2002), *citing Pfaff*, 525 U.S. at 59. An invention has been "reduced to practice" if an inventor has both "constructed an embodiment or performed a process that [meets] all the limitations" and "determined that the invention would work for its intended purpose."[1] *Taskett v. Dentlinger*, 344 F.3d 1337, 1340 (Fed. Cir. 2003). Glory argues that the two prototypes built by Cummins, and the twenty machines built for on-site beta testing, all exhibit that Cummins had reduced its invention to practice prior to May 19, 1991.

If the inventor was testing the claimed features of the invention, known as the "experimental use" negation of the public use bar, a patent may be found valid even if the tests were conducted in

---

[1] Glory's motion stresses that the CRU machines had been "reduced to practice" and that the experimental use doctrine does not apply because the CRU machine performed its "basic intended function," citing *Taskett*. *Taskett* does not include the term "basic." Rather, *Taskett* sets forth the same requirement as other precedent from the Federal Circuit that reduction to practice occurs when an inventor has both "constructed an embodiment or performed a process that [meets] all the limitations" and has "determined that the invention would work for its intended purpose." *Id*.

7

the public eye. *See EZ Dock,* 276 F.3d at 1353. "Reduction to practice" and "experimental use" involve similar proof: that an invention works for its intended purpose. *Id.* at 1352. "An inventor does not inappropriately delay filing 'by a bona fide effort to bring his invention to perfection, or to ascertain whether it will answer the purpose intended.'" *Id.*, *quoting Pfaff*, 525 U.S. at 64-65; *see also Eli Lilly*, 471 F.3d at 1381 ("The use of an invention by the inventor himself, or any other person under his direction, by way of experiment, and in order to bring the invention to perfection, has never been regarded as [a public] use.") *quoting City of Elizabeth v. American Nicholson Pavement Co.*, 97 U.S. 126, 134 (1877). Experimental use is not infinite, however. "Once an inventor realizes that the invention indeed works for its intended purpose, further 'experimentation' may constitute a barring public use." *New Railhead*, 298 F.3d at 1297, *quoting RCA Corp. v. Data Gen. Corp.*, 887 F.2d 1056, 1061 (Fed. Cir. 1989). Once an accused infringer alleges public use prior to the critical date, the patent holder may introduce evidence of experimental use to negate the accused infringer's allegation. *See Electromotive Div. of General Motors, Corp. V. Transp. Div. Of General Elec., Inc.*, 417 F.3d 1203, 1212 n.2 (Fed. Cir. 2005).

In this case, Cummins has established a genuine issue of material fact that its use of the CRU machines at the on-site testing locations was experimental. Glory relies upon the position that the existence of a prototype is an example that a machine has been reduced to practice. *See Robotic Vision Sys., Inc. v. View Eng'g, Inc.*, 249 F.3d 1307, 1312 n.2 (Fed. Cir. 2001) (finding that lack of skepticism about "the workability of an invention" is not a requirement for establishing readiness for patenting). But in this case, the existence of a CRU machine does not in itself show that the invention was reduced to practice, in that it functioned for its intended purpose or met the claimed limitations. Both the '806 and the '196 Patents do not merely claim a machine. The Patents claim

an invention that can read and denominate currency accurately at a specifically high rate of speed. The evidence produced by Cummins, and in some cases produced by Glory, reveals a genuine issue as to whether the prototypes and beta tested CRU machines could perform at the speed, and with the degree of accuracy, that the patent limitations claim. Certainly Glory has produced evidence unfavorable to Cummins, including a memorandum suggesting that the patents were ready to be filed as early as February 1991, implying that the inventions were reduced to practice by that point. *See Adli Dec.*, Ex. 14. But Cummins has raised facts creating an issue that the tests performed on the machines throughout the spring of 1991 were not merely attempts to "perfect" the function of the machine, cure uncertainty about performance, or to give it commercial exposure to potential buyers, but rather were tests to check whether the CRU machines could, in fact, perform their claimed functions.

The degree of control over the invention is another factor considered in a determining whether the use of an invention in public was experimental. *See Petrolite*, 96 F.3d at 1427-28 ("The last factor of control is critically important, because, if the inventor has no control over the alleged experiments, he is not experimenting.") *quoting Lough v. Brunswick Corp.*, 86 F.3d 1113, 1120 (Fed. Cir. 1996); *see also EZ Dock*, (reviewing degree of control and involvement of the inventor in monitoring the performance of the publicly placed dock). Cummins has produced evidence of control over the on-site CRU machines sufficient to survive summary judgment. Cummins employees testified that they visited the sites often, removed machines exhibiting problems, and trained employees on filling out detailed questionnaires concerning their use of the machine and any problems they encountered.

Additionally, Cummins has provided a viable reason why those tests needed to be performed on-site at commercial locations rather than within the secretive confines of Cummins' own property, negating Glory's arguments that Cummins placed the machines on-site in order to expose the CRU machines to potential customers. *See Pfaff*, 525 U.S. at 65 ("The law has long recognized the distinction between inventions put to experimental use and products sold commercially.") According to Douglas Mennie, the head of the CRU project at Cummins, Cummins needed to test the CRU's ability to handle real-world conditions. In order to complete frequent tests Cummins needed significant quantities of money, and in order to test accuracy, Cummins needed money in real-world conditions of disrepair. The documentation and testimony reflect that crisp, new bills could move through the machine with greater ease than bent, curled, and worn bills. The documentation and testimony also suggest that the machines could discern the values and the "strangers" in some denominations of bills more easily than in others. *Compare New Railhead*, 298 F.3d at 1297 (granting summary judgment of invalidity for non-experimental prior use where there was "no suggestion whatsoever" that the patented method used prior to the critical date did not meet each and every one of the claimed limitations); *EZ Dock*, 276 F.3d at 1352-53 (denying summary judgment where public use of a dock, sold to a customer, might be experimental where the location of the dock had different conditions than that of the prototype). There is a genuine issue of fact the on-location tests were necessary in order to simulate real world conditions and determine that the CRU machines could perform each of the intended functions and each of the claim limitations.

## Conclusion

Glory has not met its burden to show by clear and convincing evidence that Cummins' invention was invalidated by public use prior to the Critical Date. Cummins has raised specific facts

supporting that Cummins' use of the CRU machines was not public, and if public was experimental, negating the statutory bar against prior public use. Glory's Motion for Summary Judgment for Prior Public Use is denied.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: February 12, 2007